IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALEXIS JOEL AMAYA, | 9th Circuit Case No. 18-17124 |
| Petitioner-Appellant, | D.C. No. 4:16-CV-05069-PJH |
| v. | Northern District of California (Oakland) |
| SCOTT FRAUENHEIM, Warden | |
| Respondent-Appellee. | |

**APPELLANT'S OPENING BRIEF**

Appeal from the United States District Court
for the Northern District of California,
Phyllis J. Hamilton, Chief District Judge

Gene D. Vorobyov, California Bar No. 200193
450 Taraval Street, # 112
San Francisco, CA 94116
(415) 425-2693; gene.law@gmail.com

Attorney for Appellant
ALEXIS JOEL
AMAYA

- 1 -

# Table of Contents

Table of Authorities……………………………………………..……vi

Statement of Jurisdiction…………………………………………..……2

Statement of Certified Issues…………………………………………...……2

Statement of the Case……………………………………………..……..3

Statement of Facts

    A.    Background Information………………………………………3

    B.    Jocelyn Reports Molestation Allegations Against Amaya to Her Therapist Four Years After They Allegedly Happened ………………………………………………………………4

    C.    The Trial

        1.    The prosecution

            i.    *Jocelyn's Doe's allegations*……………………………..6

            ii.    *Testimony of Jocelyn's parents*………………….....……9

            iii.    *Pretext phone call*…………………….…..………10

            iv.    *CSAAS testimony*…………………………………13

i

2.    The defense…………………………………………...……16

Standard of Review………………………………………………….………18

Summary of Argument…………………………………………...………19

Argument

I.    The Admission of Evidence of the Child Sexual Abuse
      Accommodation Syndrome Violated Amaya's Federal Due
      Process Rights

      A.    Factual Background

            1.    State trial court proceedings…………………...……24

            2.    State court of appeal's decision………………….…27

            3.    The district court's denial of the claim………..………30

      B.    General Legal Principles re: AEDPA Review…………….……31

      C.    Admission of CSAAS Evidence Made Amaya's Trial
            Fundamentally Unfair in Violation of his Federal Due Process
            Rights

            1.    Clearly established federal law for the purpose of
                  Amaya's federal due process claim is *Estelle v. McGuire*
                  and *Michigan v. Bryant*……………………………………33

ii

2. There can be no fair-minded disagreement that admission of CSAAS evidence made Amaya's trial fundamentally unfair in violation of his federal due process rights because CSAAS is not scientifically reliable evidence of molestation, which, given the instructions, the jury was likely to misuse as evidence of molestation

  i. CSAAS is not scientifically reliable evidence of molestation, from which the jury could draw no permissible inference……………………………….36

  ii. The jury was likely to misuse CSAAS evidence as showing Amaya's guilt because jury instructions told the jury to use the evidence to evaluate Jocelyn Doe's credibility and to determine if her behavior is not inconsistent with that of a molest victim……………………………….….38

  iii. The district court's denial of the claim was erroneous……………………………….………44

D. Admission of CSAAS Evidence Had a Substantial and Injurious Effect on the Guilty Verdict

  1. General legal principles…………………………...………47

iii

2.     The error is prejudicial under *Brecht* because it impacted a key disputed issue at trial and the evidence of guilt was not overwhelming, as shown by the jury's prolonged deliberation in a factually simple case and the initial deadlock……………………………….…………48

II.     The State Trial Court Violated Amaya's Sixth and Fourteenth Amendment Rights by Permitting Supplemental Closing Argument After the Jury Pronounced Itself Deadlocked

A.     Factual Background

1.     State trial court permits supplemental argument about factual issues dividing the jury after the jury pronounced itself deadlocked 7-5 following more than two days of jury deliberations and re-reading of key testimony……51

2.     California Court of Appeal's rejection of the claim…....56

3.     The district court finds the California Court of Appeal's denial is not objectively unreasonable……………..………58

B.     The State Court Violated Amaya's Sixth and Fourteenth Amendment Rights By (1) Determining the Reason for Jury Deadlock and (2) Permitting the Lawyers to Inject Themselves into Jury Deliberation by Providing Supplemental Argument on Factual Issues the Jury Was Struggling to Decide

iv

       1.     Under clearly established federal law in *Lowenfield*, Amaya's constitutional rights were violated if, under the totality of circumstances, the state court's actions had a coercive effect on the jury verdict………………………..61

       2.     The California Court of Appeal's rejection of the claim was an objectively unreasonable application of *Lowenfield* ……………………………………………..……………..66

    C.     Amaya Need Not Show Prejudice to Obtain Habeas Relief; But if Such Showing is Required, the Verdict Came Shortly After the Offending Closing Argument, Creating Grave Doubt That the Argument Had Substantial and Injurious Effect on the Verdict…………………………………………………………..70

    D.     To the Extent Denial of this Claim Is Based Under the Rubric of Ineffective Assistance of Counsel, the California Court of Appeal's Denial of that Claim is Objectively Unreasonable ………………………………………………………...………71

Conclusion…………………………………………………...………………73

Certificate of Related Cases…………………………………………...………74

Certificate of Word Count……………………………………………..……75

v

# Table of Authorities

<u>U.S. Supreme Court Cases</u>

*Allen v. United States*
164 U.S. 492 (1896)……………………………………………………………58

*Brecht v. Abrahamson*
507 U.S. 619 (1993)…………………..……………………………..………47, 48

*Cullen v. Pinholster*
563 U.S. 170 (2011)………………………………..………..…………32, 71

*Dowling v. United States*
493 U.S. 342 (1990)………………………………………………………34

*Estelle v. McGuire*
502 U.S. 62 (1991)……………………………………………………33, 34, 44

*Harrington v. Richter*
562 U.S. 86 (2011)………………………………………………..………18, 31

*Lowenfield v. Phelps*
484 U.S. 231 (1988)…………………………………………………*passim*

*Michigan v. Bryant*
562 U.S. 344 (2011)……………………………………………..………33, 34, 44

*O'Neal v. McAninch*
513 U.S. 432 (1995)………………………………………………………47

*Panetti v. Quarterman*
551 U.S. 930 (2007)……………………………………………………… 32

*Perry v. New Hampshire*
565 U.S. 228 (2012)……………………………………………………….33

*Rompilla v. Beard*
545 U.S. 374 (2005)……………………………………………………….72

*Strickland v. Washington*
466 U.S. 668 (1984)…………………………………………...…………71, 72

*White v. Woodall*
572 U.S. 415 (2014)…………………………………………...…32, 64

*Ylst v. Nunnemaker*
501 U.S. 797 (1991)……………………………………………………….33

U.S. Circuit Cases

*Brodit v. Cambra*
350 F.3d 985 (9th Cir. 2003)………………………………….30, 32, 45, 46

*Fairbank v. Ayers*
650 F.3d 1243 (9th Cir. 2011)……………………………..………………18, 32

*Gill v. Ayers*
342 F.3d 911 (9th Cir. 2003)………………………………...………47

*Hall v. Haws*
861 F.3d 977 (9th Cir. 2017)…………………………………...………47

*Hedlund v. Ryan*
854 F.3d 557 (9th Cir. 2017)……………………..…………………….71

*Medley v. Runnels*
506 F.3d 857 (9th Cir. 2007)……………………………………………..33

*Parker v. Small*
665 F.3d 1143 (9th Cir. 2011)……………………………………………60

*Smith v. Curry*
580 F.3d 1071 (9th Cir. 2009)…………………………..…………61, 62, 63, 70

*Thomas v. Chappell*
678 F.3d 1086 (9th Cir. 2012)……………………………………………49

*United States v. Antone*
981 F.2d 1059 (9th Cir. 1992)…………………………………...…… 46

*United States v. Bighead*
128 F.3d 1329 (9th Cir. 1997)…………………………………………30, 45, 46

*United States v. Evanston*
651 F.3d 1080 (9th Cir. 2011)…………………………………59, 63, 64, 65, 70

*Valerio v. Crawford*
306 F.3d 742 (9th Cir. 2002)……………………………………...………47

viii

## California Cases

*People v. Patino*
26 Cal. App. 4th 1737 (1994)……………………………………………37

*People v. Young*
156 Cal. App. 4th 1165 (2007)……………………………………..…56

## Other State Cases

*State v. Ballard*
855 S.W.2d 557 (Tenn. 1993)………………………………………..36

*Com. v. Dunkle,*
529 Pa. 168 (1992)………………………………………..………..36

*State v. J.L.G.*
234 N.J. 265 (2018)………………………………………..………36

*State v. Maule*
35 Wash. App. 287 (1983) ……………………………..……………37

*Sanderson v. Com.,*
291 S.W.3d 610 (Ky. 2009) ……………………………………….36

## Federal Statutes

28 U.S.C.

    § 2253……………………………………………...………………………2

§ 2254…………………………………………..…………………………18

California Statutes

California Evidence § 801……………………………………...……………28

California Penal Code § 288.7…………………………………...……………3

Cal. R. Ct. 2.1036…………………………………………………………..59

Other State Statutes

Ariz. R. Crim. P. 22.4…………………………………...………………59

N.D. R. Ct. 6.9…………………………………………...………………59

x

## Statement of Jurisdiction

Alexis Joel Amaya filed the instant federal habeas corpus petition in the Northern District of California.  On June 8, 2018, the district court filed a judgment denying the petition.  (CR Doc No. 32). The district court had jurisdiction under 28 U.S.C. § 2254.

In denying the petition, the district court issued a certificate of probable cause.  (Cr. Doc No. 32).  Petitioner filed a timely notice of appeal June 30, 2018.  (Cr. Doc. No. 35).  This Court has jurisdiction over this appeal under 28 U.S.C. § 2253(c).

## Statement of Certified Issues

The district court certified these issues for appeal:

I.    Did the admission of evidence of Child Sexual Abuse Accommodation Syndrome ("CSAAS") violate Amaya's federal due process rights?

///

- 2 -

II.     Did the state trial court violate Amaya's Sixth and Fourteenth

Amendment rights by permitting supplemental closing argument after the

jury pronounced itself deadlocked?

## Statement of the Case

A California state court jury convicted Amaya of two counts of

violating California Penal Code § 288.7 [sexual penetration of a child age

10 or younger].  The state court sentenced Amaya to two concurrent 15-

to-life terms.  The California Court of Appeals affirmed the conviction

and sentence in an unpublished decision.  The California Supreme Court

denied review.  (Cr. Doc No. 23 at 1).  Appellant then filed this federal

petition, which the district court denied.

## Statement of Facts

### A.     Background Information

Amaya was 31 years old at the time of trial and 26 when the relevant

events took place.  (2 ER 188).  He was born and grew up in El Salvador,

seventh or eighth of the 15 siblings in the family of field workers.  (3 ER

- 3 -

310).  Amaya has a sixth-grade education.  (3 ER 310-11).

Amaya came to this country when he was 20 years old in 2003.  (3 ER 311).  At the time of the incident, Amaya was living San Jose and +playing in a musical group with his brothers Marvin and Erick.  (3 ER 312).  Amaya also worked in yard maintenance and in the parks.  (*Id*).  Amaya was married, but had no children.   (1 ER 032).

Jocelyn Doe is Amaya's niece; she is a daughter of his brother Elo.  (3 ER 313).  Amaya first met Jocelyn in 2003 and over the years, he had a significant amount of contact with her.  (*Id*.)

**B**.  **Jocelyn Reports Molestation Allegations Against Amaya to Her Therapist Four Years After They Allegedly Happened**

When Jocelyn Doe was 13 years old, she was seeing a therapist because her parents had recently separated.  (1 ER 027).  Jocelyn told her therapist that Amaya molested her when she was 9.  (*Id*).  The therapist told Jocelyn's parents and alerted Child Protective Services, which in turn called law enforcement.  (*Id*).

- 4 -

The police interviewed Jocelyn without her parents' presence. (2 ER 137).

The police then arranged a pretext phone call between Jocelyn and Amaya. (1 ER 027). When Jocelyn confronted Amaya with her molestation claims, Amaya denied touching her and suggested that Jocelyn might have misinterpreted something that had happened while they were playing a game. (*Id*). Later, Amaya voluntarily went to the police station for an interview. (*Id*). Amaya told the police that Jocelyn may have misunderstood something that had occurred during a game. (*Id*).

At trial, Amaya repeatedly and consistently denied Jocelyn's accusations. (1 ER 027).

///

///

///

///

- 5 -

## C.     The Trial

### 1.     The prosecution

> #### i.     Jocelyn's Doe's allegations

Jocelyn was 14 years old at the time of trial and was 9 when the alleged acts of molestation took place.  (1 ER 027).

When Jocelyn was 9, she was living in San Jose with her parents and her younger sister, and Amaya and his wife.  (1 ER 027).  The alleged touching occurred in Amaya's bedroom.  (*Id*).

According to Jocelyn, she and her sister were watching a movie on Amaya's bed in his bedroom.  (1 ER 027).  Jocelyn was wearing a nightgown with underwear underneath.  (*Id*).  Amaya was on the bed with them.  (*Id*).  Jocelyn was lying with her back against the front of Amaya's body.  (*Id*).  Jocelyn's sister was lying in front of Jocelyn and Jocelyn had her arms around her.  (*Id*).  And Amaya had his arms around Jocelyn.  (*Id*).

///

At some point, Jocelyn's sister walked out of the room, leaving Amaya and Jocelyn alone. (1 ER 028). Amaya had his hands on Jocelyn's legs, and he started moving them up towards her stomach under her nightgown. (*Id*). This made Jocelyn uncomfortable, but she said nothing because she was scared. (*Id*). When Amaya's hands reached Jocelyn's stomach, he moved them lower and inside her underwear. (*Id*). Amaya touched Jocelyn's vagina and put his finger inside. (*Id*). Amaya's fingers were moving in and out, and it hurt. (*Id*). When Jocelyn started crying, Amaya told her to be quiet. (*Id*). The entire incident lasted about five minutes. (*Id*).

Amaya stopped touching Jocelyn when her sister came back into the room. (1 ER 028). Jocelyn was scared and upset, but said nothing to Amaya or her parents at time because she was not sure they would believe her. (*Id*).

///

- 7 -

Amaya touched Jocelyn again the next day. (1 ER 028). Jocelyn and her sister were again in Amaya's room on Amaya's wife's bed watching a movie. (*Id*). Amaya told them to get on Amaya's bed. (*Id*). Jocelyn did not want to do it, but she went along because her sister wanted to. (*Id*). Jocelyn then arranged for her sister to lie between her and Amaya because she did not want Amaya touching her again. (*Id*). When Jocelyn's sister left the room, Amaya grabbed Jocelyn's writ and pulled her towards him. (*Id*). Amaya then put his finger inside Jocelyn's vagina and moved it without saying anything. (*Id*). Jocelyn was in pain, but said nothing. (*Id*). The touching lasted for about five minutes and stopped when Jocelyn's sister came back into the room. (*Id*). Jocelyn did not report this incident to her parents because she did not think they would believe her and was afraid she would get in trouble. (*Id*).

Jocelyn did not report the molestation to anyone until she was 13 and spoke to her therapist. (1 ER 028). In the course of getting to know Jocelyn

- 8 -

in the therapy session the therapist asked Jocelyn if anyone had ever touched her improperly. (*Id*). Jocelyn did not want the therapist to report this to her parents or to anyone, but she ultimately told the therapist because she thought it might make her feel better. (1 ER at 029). Jocelyn was angry when the therapist told her it would have to be reported. (*Id*). Jocelyn did not want to speak to the police at first, but eventually spoke with them. (*Id*).

The police arranged for a pretext phone call between Jocelyn and Amaya. (State Court Decision at 4). Jocelyn became angry during the call because Amaya repeatedly denied the molestation and suggested Jocelyn must have been confused about a game they were playing. (*Id*).

ii.    *Testimony of Jocelyn's parents*

Jocelyn's parents learned of the allegations from the therapist. (1 ER 029). Soon after, Jocelyn's father (Amaya's brother) told Amaya about she Jocelyn reported. (*Id*). When the police left Jocelyn's parents a message,

- 9 -

they did not call back for a month. (*Id*). When the police called again,

Jocelyn's father called back and brought her in for an interview. (*Id*).

Jocelyn's father testified that he never saw anything improper

between Amaya and Jocelyn. He also stated that he never saw Amaya

engage in any conduct that would suggest he would be involved in a crime

of this nature. (1 ER 029).

### iii. *Pretext phone call*

The pretext call arranged by the police was mostly in Spanish.

According to Detective Nichols who arranged the call, Jocelyn was nervous

and crying during the call. (1 ER 030). The audio recording of the call was

played for the jury and the jury received the English and Spanish-language

transcripts of the call. (*Id*).

In the call, Jocelyn told Amaya she was home from school because

she was sick. (1 ER 030). Jocelyn then asked Amaya if he remembered

touching her when she was nine and said she was concerned about getting

pregnant. (*Id*). Amaya, expressing surprise and confusion, said he did not understand what Jocelyn was talking about. (*Id*). Jocelyn said "You touched me down there like inappropriately." (*Id*). Amaya denied doing so. (*Id*). Jocelyn responded "Yes, you put your fingers there on my va – on my vagina." (*Id*).

Amaya asked if Jocelyn was referring to some game they might have been playing. (1 ER 030). Jocelyn said they were not playing a game at the time. (*Id*). Jocelyn said it happened when they were on Amaya's bed, after Jocelyn's sister had left the room. (*Id*). Amaya remembered playing with Jocelyn and the other children, and he suggested that Jocelyn must be misinterpreting what had happened during a game. (*Id*). Jocelyn continued to insist that it did not happen during a game. (*Id*). Amaya continued to suggest that she was misinterpreting or misunderstanding what had happened during some game—e.g., when he had hugger her or picked her up. (*Id*). At no point did Amaya admit touching Jocelyn's

vagina. (*Id*).

Amaya voluntarily went to the police station for an interview. (1 ER 030). Amaya spoke to Detective Nichols and another officer acted as a Spanish translator. (*Id*). Amaya told the police that Jocelyn may have misunderstood something that took place during a game. (*Id*.) Amaya also said that he could have touched her accidentally. (*Id*).

During the interview, the police conducted a "DNA ruse." (1 ER 030). The police lied to Amaya about performing a DNA test on Jocelyn's vagina and presented Amaya with a phony test report purporting to show that his DNA had been found on Jocelyn's vagina. (*Id*). When the police asked Amaya to explain the result, he said that "perhaps I touched her part in some moment I did not realize." (*Id*). At no point did Amaya confess to performing any sexual act on Jocelyn. (*Id*).

///

///

- 12 -

iv.  *CSAAS testimony*

Miriam Wolf, a licensed clinical social worker, testified for the

prosecution as an expert on Child Sexual Abuse Accommodation

Syndrome ("CSAAS").  (1 ER 031).  Wolf was unaware of the facts of the

case.  (*Id*).  She did not interview any witnesses, read any reports or

transcripts, or participate in the investigation in any way.  (*Id*).

CSAAS is a term that first appeared in an article written by Dr.

Ronald Summit in the Journal of Child Abuse and Neglect in 1983.  (1 ER

031).  Dr. Summit wrote the article to document the behavior he saw in

treating child victims of sexual abuse.  (*Id*).  He wrote it because the child

victims he was familiar with showed behavior patterns unexpected by

adults.  (*Id*)

The article was not a research article; it was based on anecdotal

evidence.  (1 ER 031).  CSAAS is not an actual syndrome or diagnosis

proving whether a child had been sexually abused.  (*Id*).

- 13 -

CSAAS consists of five categories of behavior: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, conflicted, and unconvincing disclosure; and (5) retraction. (1 ER 031). Secrecy refers to the fact that abuses generally takes place in secret. (*Id*). The abuser is often in a position of power, and communicates the need for secrecy to a child. (*Id*). Helplessness refers to the child's cognitive inability to understand appreciate the consequences of a sexual encounter with an older person. (*Id*). The child may experience emotional helplessness because the abuser sends the message that the child cannot disclose the abuse to trusted persons such as teachers or parents, or the child believes that such people will not be available to help them. (*Id*).

Entrapment and accommodation mean that children have to figure out how to cope with the situation and continue with their daily lives. (1 ER 031). Some children appear outwardly healthy, while others may develop psychosocial symptoms as a way of coping. (*Id*). Delaying,

- 14 -

conflicting, or unconvincing disclosure means that the child may not disclose the abuse for a long time period, and the disclosure does not "come out in a nice, neat package the way an adult might expect it to …." (*Id*). "The disclosure may be conflicted or unconvincing, and parts of it may not make sense to an adult." And finally, retraction or recantation refers to the fact that a child may take back claims of abuse because of the consequences of disclosure, such as the loss of parental support or criminal prosecution. (*Id*).

Wolf noted that Dr. Summit published another paper in 1992, expressing concern about how CSAAS is being used in court. (1 ER 031). Dr. Summit wrote that he had never intended for CSAAS to be used as a diagnostic tool or checklist. (*Id*). He only intended to dispel myths held by many adults about how children would behave when molested. (*Id*). Dr. Summit was concerned that prosecutors were using CSAAS to prove up criminal cases, while CSAAS is not intended to be used to determine the

- 15 -

truth or falsity of allegations. (*Id*). Instead, CSAAS starts with the premise that allegations made by the child victim are true. (*Id*).

Wolf had seen many patterns of behavior she described in the children she had worked with. (1 ER 032). Wolf also said that while Dr. Summit's research has not been universally accepted by other researches, there is a "growing consensus" on many aspects of CSAAS. (*Id*). As to delayed disclosure, Wolf said there is "a lot of consensus among different researches that children don't disclose sexual abuse for lengthy periods of time, sometimes into adulthood. When they disclose, it is often after lengthy delays." (*Id*). Wolf also said that recantation or retraction is not as common as Dr. Summit believed it to be when he wrote the original article. (*Id*).

### 2.    The defense

Many relatives and friends testified as character witnesses on Amaya's behalf, including four brothers, three sisters, one sister-in-law,

two friends, and his wife. They testified that it would be out of character for Amaya to commit a sexual act on a minor, and they had never seen him do so. (1 ER 033). They also testified that they knew Amaya to be an honest person. (3 ER 366-74).

Several of these witnesses also testified that Jocelyn was an honest person. (1 ER 038).

And Amaya took a stand in his own defense. He repeatedly denied touching Jocelyn's vagina or "private parts." (1 ER 033).

When Jocelyn's father told Amaya about her allegations, he only said that Jocelyn said he touched her; Amaya did not know the details of her allegations. (1 ER 033). Amaya called all his siblings and told them what was happening. (*Id*). Amaya did not talk to Jocelyn about it until the pretext phone call. (*Id*). Amaya thought the call was a joke or "like a game." (*Id*). At that time, Amaya did not know Jocelyn had accused him of putting his finger in her vagina. (*Id*).

- 17 -

## Standard of Review

This Court reviews de novo the district court's denial of the

habeas petition. *McMurtrey v. Ryan*, 539 F.3d 1112, 1118 (9th Cir. 2008).

To obtain relief under Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"), Amaya has to show that the

state court's decision on the merits of his claim (1) was contrary to

clearly established federal law as determined by the Supreme Court,

(2) involved an unreasonable application of such law, or (3) was

based on the unreasonable determination of facts given the

record before the state court. 28 U.S.C. § 2254; *Harrington v. Richter*, 562

U.S. 86 (2011); *Fairbank v. Ayers*, 650 F.3d 1243, 1251 (9th Cir. 2011).

///

///

///

///

- 18 -

## Summary of Argument

### A.    Admission of CSAAS Evidence Violates Due Process

The state court violated Amaya's federal due process rights by admitting CSAAS evidence.  CSAAS is not reliable scientific proof of molestation.  For this reason, many states prohibit its use as evidence of molestation, *including California*.

The way California sought to avoid this problem is to instruct the jury that CSAAS is not evidence of molestation.  But that same instruction also tells the jury it can use CSAAS evidence to evaluate the child complaining witness's credibility and to determine whether the child's behavior is consistent with that of a child molest victim.  This was a child molestation trial, in which the child's credibility was a pivotal issue.  The jury was directed to use CSAAS evidence to evaluate the credibility of the child's account.  And that evidence boosted credibility of the child's account by providing a reason (other than that her account is not credible)

- 19 -

for the child not reporting the allegations to her parents when they happened four years prior. And that is how the prosecutor urged the jury to use the evidence. For these reasons, the jury reasonably likely used CSAAS evidence as circumstantial (if not direct) proof of molestation.

This resulted in a fundamentally unfair trial. The jury could draw no permissible inference from CSAAS evidence, which even California agrees could not be used as evidence of molestation. Yet the instructions (as amplified by the prosecutor's argument) permitted the jury to consider CSAAS evidence at least as circumstantial proof of Amaya's guilt.

And this due process error had a substantial and injurious effect on the verdict. The erroneously admitted evidence went to the key disputed issue—Jocelyn's credibility—by providing an unjustified boost to it. And it helped the prosecution get over a difficult aspect of its case—Jocelyn's failure to report for four years to her parents (or to anyone else) what had allegedly happened to her. And as the district court recognized, the

evidence of guilt was close, as further shown by prolonged jury

deliberation in a factually simple case, the jury asking for readback of key

witness testimony, and the jury being first deadlocked 7-5. That deadlock

was broken shortly after supplemental argument a separate constitutional

violation (see certified issue II).

**B**.    **The State Court Allowing Supplemental Closing Argument After the Jury Deadlocked Violated Amaya's Sixth and Fourteenth Amendment Rights**

The state court's allowing supplemental argument to a deadlocked

jury on factual issues at the heart of the deadlock violated Amaya's rights

under the Sixth and Fourteenth Amendments. Under clearly established

federal law, the state trial court's permitting of supplemental arguments

under the circumstances of the case violated Amaya's constitutional right if

it had a coercive effect on the jury verdict.

Here, the court's actions had such a coercive effect. After

deliberating for more than one judicial day in a factually uncomplicated

case and received readback of critical witness testimony, the jury

pronounced itself deadlocked.  The jury at first declined the court's

invitation for more instructions or testimony readback.  At that point, the

court asked for the jury's numerical division on the merits (7-5),

suggested it would send the jury back for more deliberations and asked

whether the jury would be willing to identify the issue of disagreement

and receive supplemental argument on that issue.  When the jury identified

the issue as definition of reasonable / possible doubt, the court re-read the

reasonable doubt instruction, and should have stopped there.

Instead, over the defense objection that such supplemental argument

interferes with the deliberative process by making court and counsel a part

of it, the court allowed supplemental argument on that same issue.  And

while defense counsel generally stuck to the legal issue the jury asked

about, the prosecutor (who went last) presented a detailed factual

argument as to which portions of the evidence the jury should and should

not credit in finding the State had proven its case.

On these facts, the court obtaining the jury's numerical division on the merits, finding out the issue that divided the jury, and allowing supplemental argument on it had a coercive effect on the verdict. The court's actions may have been well-intentioned, but in context, how much the court injected itself and counsel in deliberations was reasonably likely to create pressure on the jury to reach a verdict at the expense of individually held views on the evidence. And the California Court of Appeal's analysis and conclusion that the court's acts were within its discretion and not coercive is objectively unreasonable.

///

///

///

///

///

- 23 -

## Argument

## I.

## The Admission of Evidence of the Child Sexual Abuse Accommodation Syndrome Violated Amaya's Federal Due Process Rights

### A.    Factual Background

### 1.    State trial court proceedings

At trial, the prosecution moved to admit the testimony of Miriam Wolf about the CSAAS, arguing it was relevant to the issues of keep abuse a secret, helplessness, and delayed disclosure.  (2 ER 162; 3 ER 493-94).   Amaya objected because (1) CSAAS evidence has not gained general acceptance as reliance in the scientific community,[1] and (2) any marginal relevance of this evidence was outweighed by the danger of unfair prejudice, and jury confusion and misapplication of the evidence. (2 ER 161).   On the latter, argument, Amaya pointed out that there is a

---

[1] *People v. Kelly*, 17 Cal. 3d 24 (1976); *Frye v. United States*, 293 F.3d 1013 (D.C. Cir. 1923)..

- 24 -

great risk that the jury would simply compare the facts of the car to the
more general description of CSAAS to conclude Jocelyn Doe had been
molested.  (3 ER 492).   The trial court admitted Wolf's testimony.  (1 ER -
074-75).

Wolf then testified along the lines described in the statement of
facts.  (1 ER 031-32).

Before Wolf testified, the jury was instructed that Wolf's testimony
is not evidence that Amaya committed any of the charged acts.  (2 ER
188).  But the jury was permitted to consider Wolf's testimony to
determine the believability of Jocelyn Doe's testimony and whether her
conduct was inconsistent with the conduct of someone who had been
molested.  (*Id*).  The jury received the same instructions before it went to
deliberate.  (3 ER 416).

In closing argument, the prosecutor relied on CSAAs evidence to
support credibility of Jocelyn Doe's allegations against Amaya:

And, you know, Miriam Wolf came in here to testify, because there is a child, like so many loving parents, a mom and dad who are in the home who came back later on, and there is a thought of sometimes people: Why didn't she say something to her mom? And before Ms. Wolf testified, Judge Bocanegra read you the instruction 1193.

Ms. Wolf didn't come here to say what happened in this case or to opine on Mr. Amaya's guilt or Jocelyn telling you truth, but for this reason. So that when you are evaluating her credibility, when you are in the back, when you are in the deliberation room deciding whether or not the People have proved this case, your minds are open and she has a fair shot at her credibility being evaluated without -because maybe one of the jurors, people out in the world, and we know Mr. Amaya referenced it many times and he acknowledged it on the stand, you might think, if this happened, she would have told her mom and dad. If this happened, she would have said something. If this happened, why would she just act like everything is okay and be around him.

Some of you may feel, I don't need someone to tell me that, but the People have the burden of proof of each and every element, including issues that affect credibility that might detract from your ability or your -- not ability, but your open-mindedness in terms realizing that one fact alone does not mean this doesn't happen.

(3 ER 422-23).

- 26 -

The jury deliberated over the course of 4 judicial days, requested readback of testimony of several witnesses (including Jocelyn Doe), and reported itself deadlocked (with the split being 7-5). (3 ER 495-500; 1 CT 183, 185, 187-88, 223-228). The jury had arrived at a unanimous verdict only after, over the defense objection, the trial court permitted attorneys to present supplemental argument. (1 ER 047, 052-53, 055-67)).

## 2. State court of appeal's decision

In his state appeal, Amaya renewed his challenge to the admissibility of the CSAAS evidence, arguing that (1) that admission of the evidence violates his federal due process rights and (b) that trial counsel violated Amaya's Sixth Amendment rights by not making the due process objection in the trial court. (State Court Exhibit 1, State AOB 14-15).

///

///

Amaya argued admission of CSAAS evidence made his trial

fundamentally unfair in violation of the federal due process clause

because CSAAS evidence was irrelevant to any of the disputed issues at

trial and was unfairly prejudicial.  (State Court Exhibit 1, State AOB 18-

26).  As the basis for this argument, Amaya reiterated that (1) CSAAS

evidence has not gained acceptance as reliable in the scientific

community, and (2) the general public is sufficiently familiar with the

subject of sexual assault and there was no need to dispel any myths.

Amaya also argued that CSAAS evidence was inadmissible under

California Evidence Code § 801(a) because CSAAS deals with a topic not

beyond the common knowledge of the jury.

The California Court of Appeal denied Amaya's Sixth and

Fourteenth Amendment claims on the merits.  (1 ER 033-36).  First, the

appellate court found that the defense presented no evidence (only

argument) as to the public no longer harboring misconceptions about the

- 28 -

behavior of victims of child molestation.  (1 ER 036).

Second, the court of appeal rejected the argument that CSAAS has not gained general acceptance as a scientific community because CSAAS evidence was never admitted as evidence of molestation.  (1 ER 036). The appellate court cited the jury instruction not to consider CSAAS evidence for that purpose and assumed the jury followed the instruction. (*Id*).

 Third, the court followed what it described as long line of precedent that CSAAS was related to the subject matter sufficiently beyond common experience.  (1 ER 036).

And finally, the appellate court found that trial counsel had not been ineffective under the Sixth Amendment in failing to object on due process grounds because such an objection would have been futile.  (1 ER 036-37).

///

- 29 -

### 3.     The district court's denial of the claim

In the district court, Amaya renewed his federal due process claim as to admission of the CSAAS evidence, but that court rejected it.  (1 ER 012).  The court reasoned that Wolf's testimony was only about the general nature of this "syndrome," citing Wolf's testimony she did not interview any witnesses or know any specific facts about the case.  (Id. at 15).  The court also relied on the jury instructions not to consider CSAAS evidence as evidence of molestation, but only to evaluate the complaining witness's credibility and to decide whether the child's behavior was not inconsistent with that of a molest victim.  (Id. at 15-16).

And the district court reasoned that there is no specific Supreme Court case that admission of CSAAS evidence violates due process.  (1 ER 016).  And the court also reasoned that the trial court's ruling was within the limits of this Court's precedent on the issue.  (*Id*/, citing *Brodit v. Cambra*, 350 F.3d 985, 991 (9th Cir. 2003) and *United States v. Bighead*,

128 F.3d 1329 (9th Cir. 1997).

The district court did not that there was no overwhelming evidence of guilt. The trial court came down to the child witness reporting two incidents of abuse and Amaya denying either incident happened. There was no corroborating physical evidence. The alleged abuse occurred when Jocelyn Doe was 9 and she did not report it until she was 13. Amaya denied the allegations in the pretext phone call and voluntarily went to the police to be interviewed. (1 ER 020).

## B.      General Legal Principles re: AEDPA Review

As noted earlier, to obtain relief under AEDPA, Amaya would have to show that the state court's decision admitting CSAAS evidence (1) was contrary to clearly established federal law as determined by the Supreme Court, (2) involved an unreasonable application of such law, or (3) was based on an unreasonable determination of the facts in light of the state court record. 28 U.S.C. § 2254; *Harrington,* 131 S.Ct. at 785;

- 31 -

*Fairbank,* 650 F.3d at 1251.

AEDPA requires this Court to give a state court's resolution of

Amaya's constitutional claims the benefit of a doubt.

*Cullen v. Pinholster,* 563 U.S. 170, 181 (2011). If the state court could have

reasonably rejected Amaya's claim, AEDPA would bar relief. *Brodit,* 350

F.3d at 987. But as explained next, there was no basis for the state court to

reasonably rejected Amaya's claim.

A state application of clearly established federal law is not immune

from federal habeas review. *Panetti v. Quarterman,* 551 U.S. 930, 953 (2007)..

Plus, to prevail under AEDPA, Amaya need not cite to a Supreme Court

case involving the same factual scenario. *White v. Woodall,* 572 U.S. 415, 427

(2014). Relief under AEDPA is available if it is beyond fair-minded

disagreement that clearly established federal law applies to a given set of

facts. *Id*.

///

- 32 -

And for the purpose of AEDPA, the last reasoned state court

decision—here, the decision of the California Court of Appeal—is the

operative state court decision.   *Ylst v. Nunnemaker*, 501 U.S. 797, 804–

06 (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007)).

## C.     Admission of CSAAS Evidence Made Amaya's Trial Fundamentally Unfair in Violation of his Federal Due Process Rights

### 1.     Clearly established federal law for the purpose of Amaya's federal due process claim is *Estelle v. McGuire* and *Michigan v. Bryant*

 Thought not every misapplication of state rules of evidence creates a

right to federal habeas relief, when, as here, improper admission of

irrelevant and unfairly prejudicial CSAAS evidence infected Amaya's trial

to a degree that made his trial fundamentally unfair.  *Estelle v. McGuire*, 502

U.S. 62, 72–73 (1991).

"Fundamental unfairness" in this context means that the challenged

action violates "those fundamental conceptions of justice which lie at the

- 33 -

base of our civil and political institutions," and "which define the community's sense of fair play and decency. *Dowling v. United States*, 493 U.S. 342, 353 (1990).

As for which errors fall into the above-noted category, we are mindful of the limited role the Supreme Court sees for the courts in the role of screening for unreliable evidence. *Perry v. New Hampshire*, 565 U.S. 228, 245–47 (2012) [recognizing in the context of inherently unreliable eyewitness identification that the jury, not the judge, traditionally determines reliability, and recognizing procedural safeguards that help keep out unreliable evidence].

Yet there is a continuing role for the due process clause to screen out unreliable evidence. In *Michigan v. Bryant*, the Supreme Court held that the federal due process clause "may constitute a further bar to the admission of, for example, unreliable evidence." *Michigan v. Bryant*, 562 U.S. 344, 370 (2011). Together with *Estelle* and *Dowling*, these Supreme Court decisions

- 34 -

amount to clearly establish federal law that admission of unreliable evidence that makes the trial fundamentally unfair violates due process. As noted earlier, clearly established federal law may be based on more than a single Supreme Court case.

> **2.    There can be no fair-minded disagreement that admission of CSAAS evidence made Amaya's trial fundamentally unfair in violation of his federal due process rights because CSAAS is not scientifically reliable evidence of molestation, which, given the instructions, the jury was likely to misuse as evidence of molestation**

Admission of CSAAS evidence violated Amaya's federal due process rights.  While CSAAS is considered junk science that many states (including California) do not admit as evidence of molestation, the jury was allowed to consider that evidence to evaluate Jocelyn Doe's credibility and to decide whether her behavior is consistent with that of a child molest victim.  But this was a child molestation trial.  Using CSAAS evidence to evaluate the credibility of a complaining witness *is* using the evidence as proof of Amaya's guilt.

- 35 -

i. *CSAAS is not scientifically reliable evidence of molestation, from which the jury could draw no permissible inference*

Several state courts, including a recent decision by the New Jersey Supreme Court, have excluded CSAAS evidence because its general acceptance in relevant scientific community has not been established. (*State v. J.L.G.*, 234 N.J. 265, 301–04 (2018) [most of CSAAS has not gained general acceptance in the relevant scientific community as reliable]; see also *Sanderson v. Com.*, 291 S.W.3d 610, 613 (Ky. 2009) [reasons for continuing exclusion of CSAAS evidence is lack of diagnostic reliability, the lack of general acceptance within the discipline from which that testimony emanates, and the overwhelmingly persuasive nature of that testimony effectively dominating the decision-making process]; *Com. v. Dunkle*, 529 Pa. 168, 173–177 (1992) [CSAAS is not generally accepted in scientific community because the syndrome is not specific enough to sexually abused children to be accurate]; *State v. Ballard*, 855 S.W.2d 557, 561–562 (Tenn. 1993) [expert testimony on CSAAS is more prejudicial than

- 36 -

probative because that testimony encourages the jury to conclude that because a child exhibits symptoms consistent with CSAAS, the defendant is more likely to have committed the charged crime]; *State v. Maule*, 35 Wash. App. 287, 295–296 (1983) [theory that sexually abused children manifest particular identifiable characteristics is unsupported by accepted medical or scientific opinion].)

In fact, California is one of the states that holds that CSAAS has not gained general acceptance as reliable evidence of child molestation and is inadmissible for that purpose. (State Court Decision at 10, citing *People v. Patino*, 26 Cal. App. 4th 1737 (1994)). But California then allows admission of CSAAS evidence for what it wrongly considers a limited purpose of evaluating the complaining witness's credibility and determining whether her behavior is consistent with that of a child molestation victim. That is the instruction the jury received here. (4 RT 155).

///

- 37 -

Except that as explained in the next subsection, this limitation is only semantic and the jury is essentially permitted to use CSAAS as proof of molestation.

ii.    *The jury was likely to misuse CSAAS evidence as showing Amaya's guilt because jury instructions told the jury to use the evidence to evaluate Jocelyn Doe's credibility and to determine if her behavior is not inconsistent with that of a molest victim*

Though the California Court of Appeal agreed that CSAAS evidence is inadmissible as proof that molestation, that court found no constitutional violation because Wolf testified CSAAS was not designed for diagnostic purposes and the jury was instructed accordingly.  (1 ER 036).  But the instruction did not merely tell the jury not to consider CSAAS evidence as evidence of molestation.  The instruction also permitted the jury to consider CSAAS evidence to evaluate Jocelyn Doe's credibility and to decide if her behavior is consistent with that of a child molestation victim.

///

///

- 38 -

The use permitted by the instructions allowed the jury to consider CSAAS evidence as proof of molestation, at least circumstantial proof. This was a child molestation trial, in which the credibility of Jocelyn's allegations was a key issue. The evidence had a natural tendency to address a gap in the prosecution's case about Jocelyn not reporting the alleged molestation to her parents or to the authorities when the acts allegedly happened. In other words, CSAAS evidence provided an explanation about the delay in reporting other than that the alleged molestation did not happen. It is unreasonable to conclude, as the state appellate court did, that the jury was told to and did not consider CSAAS evidence as proof of molestation.

And the presumption that the jury followed the trial court's instruction does not help this Court decide the appeal. There is no reason to think that the jury did not try its best to follow the court's instructions. But the problem here is that given the CSAAS evidence and the instruction

- 39 -

at hand, even the jury doing its best to follow the instructions would be

forced to consider CSAAS evidence as at least circumstantial evidence

supporting the prosecutions' case.

The prosecutor's reliance on CSAAS evidence confirms this point. (3

ER 422-23). The prosecutor cited CSAAS evidence to urge the jury to "keep

an open mind" to Jocelyn's account, even if the jury may otherwise

question the credibility of her account because she did not report it to her

parents when it allegedly happened:

> And, you know, Miriam Wolf came in here to testify,
> because there is a child, like so many loving parents, a mom
> and dad who are in the home who came back later on, and there
> is a thought of sometimes people: Why didn't she say
> something to her mom? And before Ms. Wolf testified, Judge
> Bocanegra read you the instruction 1193.
>
> Ms. Wolf didn't come here to say what happened in
> this case or to opine on Mr. Amaya's guilt or Jocelyn telling
> you truth, but for this reason. So that when you are
> evaluating her credibility, when you are in the back, when
> you are in the deliberation room deciding whether or not the
> People have proved this case, your minds are open and she has
> a fair shot at her credibility being evaluated without -because

- 40 -

maybe one of the jurors, people out in the world, and
we know Mr. Amaya referenced it many times and he
acknowledged it on the stand, you might think, if this
happened, she would have told her mom and dad. If this
happened, she would have said something. If this happened,
why would she just act like everything is okay and be around
him.

Some of you may feel, I don't need someone to tell
me that, but the People have the burden of proof of each and
every element, including issues that affect credibility that
might detract from your ability or your -- not ability, but
your open-mindedness in terms realizing that one fact alone
does not mean this doesn't happen.

(3 ER 422-23).

It is hard to see how that use of CSAAS evidence, legitimatized by

the jury instructions and the prosecutor's argument, did not direct the jury

to use CSAAS evidence as at least circumstantial evidence supporting

credibility of Jocelyn's account (and, by implication, Amaya's guilt). The

prosecutor used this evidence to argue a jury should not draw an inference

it may well reasonably draw from the fact of delayed disclosure.

///

Nor was it reasonable for the California Court of Appeal to rely on the expert telling the jury CSAAS was not developed for diagnostic use to ensure the jury did not use it as proof of molestation. (1 ER 036). The issue is sufficiently beyond the knowledge of a lay person to allow expert testimony. A well-credentialed and highly experienced witness presented to the jury evidence, which at least sounded scientific. Wolf's testimony addressed what the jury would likely perceive as a problem with the prosecution's case, in regards to the four-year delay in disclosure of the alleged molestation. CSAAS, as described by Wolf, provided an alternative explanation for this problem that enhanced credibility of Jocelyn's account.

Whether CSAAS was developed for diagnostic use, the natural inference from it may be that the delay in reporting the molestation is attributable to CSAAS, not to allegations being untrue. Such inference becomes even more likely when we consider the jury instructions (amplified by the prosecutor's argument) directing the jury to consider this

evidence to determine Jocelyn Doe's credibility. (3 ER 416, 422, 456-57).

And even if we put aside a strong likelihood the jury viewed CSAAS as evidence of molestation and assume the jury somehow only viewed it as jury education tool, the evidence could have any value for the jury only if it is scientifically reliable. Because if CSAAS is only a collection of anecdotal experiences of a therapist that are not scientific, and the jury isn't to draw *any* inference of guilt for it, its admission is fundamentally unfair.

Such evidence has no probative value on the issue of guilt, yet is likely to confuse the jury and create a significant danger of misuse. As noted earlier, the evidence is presented by a well-credentialed and experienced expert witness, it appears scientific (Wolf talked about it in terms of patterns of behavior of child victims), and also has some tendency to support the prosecution's case. Given the jury instruction and the hyper-technical difference between permissible and prohibited use of CSAAS evidence, a lay jury is likely to misuse it as evidence of guilt.

In sum, the state court admitted evidence that on the one hand is not accepted as reliable scientific proof of molestation, and thus has no relevance or probative value to any disputed issues at trial. And on the other hand, this evidence has a great potential for misuse, especially when one considers the jury instructions given about this evidence. For these reasons, admission of this evidence made the trial fundamentally unfair. California Court of Appeal's rejection of Amaya's federal due process claim was objectively unreasonable.

iii. *The district court's denial of the claim was erroneous*

The district court's denial of Amaya's federal due process claim was also erroneous. Though the district court found Amaya could not cite any Supreme Court cases supporting his claim (District Court decision at 16), for the reasons already stated, the California Court of Appeal's denial of the claim was an unreasonable application of Supreme Court decisions in *Estelle*, *Bryant*, and *Dowling*.

- 44 -

The district court was also mistaken in relying on *Brodit*, 350 F.3d 985. *Brodit* is materially different because it did not consider the arguments we make here. Petitioner in *Brodit* argued that presentation of CSAAS evidence made his molestation trial fundamentally unfair because the expert told the jury that no matter what the child said, it was consistent with molestation. *Brodit*, 350 F.3d at 991. *Brodit* rejected the argument under AEDPA, citing the state court's use of a cautionary instruction that (1) CSAAS testimony was not received as proof of molestation, and (2) CSAAS research assumes molestation has occurred while the jury was to presume the defendant innocent. *Id*.

*Brodit* reasoned also that this Court's own precedent upheld admission of CSAAS evidence, even if not against due process challenge, reasoning that admission of that testimony does not bolster credibility of the child witness and does not preclude challenges to the truthfulness of their testimony. *Brodit*, 350 F.3d at 991, citing *Bighead*, 128 F.3d 1329 and

- 45 -

*United States v. Antone*, 981 F.2d 1059 (9th Cir. 1992), 10692 (9th Cir. 1992).

Our case materially differs from *Brodit* because the jury was directed to consider CSAAS to determine Joceline Doe's credibility and to determine whether her behavior was consistent with that of a child molest victim. (3 ER 416, 422, 456-57). As noted earlier, this instruction effectively allowed the jury to use CSAAS evidence as at least circumstantial proof molestation has occurred.

Similarly, *Bighead* and *Antone* are materially different because (1) neither was decided under the due process clause and (2) neither involved use of CSAAS evidence along with a jury instruction that effectively permitted use of this evidence as proof of molestation.

For these reasons, admission of CSAAS evidence violated Amaya's federal due process rights.

///

///

- 46 -

**D.** **Admission of CSAAS Evidence Had a Substantial and Injurious Effect on the Guilty Verdict**

**1.** **General legal principles**

When, as here, the state court decision does not address the issue of prejudice, there is nothing to defer to and this Court conducts its own independent analysis of prejudice under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Hall v. Haws*, 861 F.3d 977, 991–92 (9th Cir. 2017) [No need to apply both AEDPA / *Chapman* standard of prejudice and *Brecht*].

The State bears the "risk of doubt" in this situation and must provide this Court with a "fair assurance" that there was no substantial and injurious effect on the verdict. *O'Neal v. McAninch*, 513 U.S. 432, 443 (1995); *Valerio v. Crawford*, 306 F.3d 742, 762 (9th Cir. 2002).

The inquiry is not merely whether there was enough evidence to support Amaya's conviction. *Gill v. Ayers*, 342 F.3d 911, 921–22 (9th Cir. 2003). Rather, it is whether the error itself had substantial influence on the guilty verdict; if so, or if one is left in grave doubt, the conviction cannot

- 47 -

stand.  *Id*. at 922, citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946).

> 2.     **The error is prejudicial under *Brecht* because it impacted a key disputed issue at trial and the evidence of guilt was not overwhelming, as shown by the jury's prolonged deliberation in a factually simple case and the initial deadlock**

Admission of CSAAS evidence is prejudicial under *Brecht*.  It impacted a key disputed issue at trial—Jocelyn Doe's credibility.  As even the prosecutor acknowledged, this case boiled down a credibility contest between Jocelyn and Amaya.  (1 ER 061; 3 ER 419).  There was no corroboration for Jocelyn's account, such as physical evidence of abuse or eyewitness testimony.  Amaya did not admit committing the crime in the pretext phone call or in his pretrial interview with the police.  (2 ER 193-72).  There is no evidence that Amaya engaged in similar conduct in the past or expressing sexual interest in children.  Many family members and friends testified that they had never seen Amaya engage in anything improper, and that he is an honest man.  (2 ER 173-74, 235, 241, 249, 254, 259, 275-78, 280-85, 289-92, 293-96; 3 ER 366-74).

- 48 -

And while the prosecutor stressed the testimony about other family members believing Jocelyn to be honest, they also testified that Amaya is an honest person.

The closeness of the case is reflected by the district court's comments about the evidence not being overwhelming. (1 ER 020). It is also show by the length of deliberations (over more than two judicial days in a factually simple case), the jury's requests for a readback of many witnesses (including Jocelyn Doe), and the jury deadlock broken only after additional argument of counsel (which was, by itself, a constitutional violation). *Thomas v. Chappell*, 678 F.3d 1086, 1103 (9th Cir. 2012) ["Lengthy deliberations suggest a difficult case"].

Given the closeness of the case, CSAAS evidence likely played a pivotal role. It provided a boost to Jocelyn's credibility, a key issue at trial.

///

///

- 49 -

CSAAS evidence also addressed one of the significant weaknesses in the prosecution's case—the delay in reporting of the alleged abuse—by providing an explanation supportive of Jocelyn's account (circumstantially if not directly). That is how the prosecutor urged the jury to use CSAAS evidence. (3 ER 422-23).

For these reasons, this Court should be in grave doubt about whether admission of CSAAS evidence had a substantial and injurious effect on the guilty verdict. Nothing more is needed to establish Amaya's entitlement to a conditional writ of habeas corpus.

///

///

///

///

///

///

## II.

## The State Trial Court Violated Amaya's Sixth and Fourteenth Amendment Rights by Permitting Supplemental Closing Argument After the Jury Pronounced Itself Deadlocked

**A.** **Factual Background**

**1.** **State trial court permits supplemental argument about factual issues dividing the jury after the jury pronounced itself deadlocked 7-5 following more than two days of jury deliberations**

As noted earlier, jury deliberations lasted several days. They began on the afternoon of June 6 2013. (3 ER 480, 495). On June 7, 2013, the jury asked for readback of testimony several key witnesses, including Amaya, complaining witness Jocelyn Doe, Detective Nichols (who interviewed Jocelyn after her initial report), and the transcript of the pretext phone call. (3 ER 497-500). On June 10th, the jury sent the trial court a note: "We are at a standstill! Please give us guidance and direction." (3 ER 496).

///

///

- 51 -

At the hearing about the note, the trial court asked the jury where they stood.  (1 ER 047).  The jury reported that they could not reach a unanimous decision and that the split was 7 to 5.  (*Id*.)  The court then asked if giving an instruction, clarifying an instruction, or providing readback of any additional testimony would help, and the jury replied no. (1 ER 047-48).

The trial court then said it was considering giving an instruction about deliberations and sending the jury to deliberate more.  (1 ER 048). But before doing so, the court asked if a specific area of disagreement could be identified.  (*Id*).   If it is identified, the court might consider letting the attorneys present 10-15 minutes of additional argument and then send the jury back to deliberate.  (*Id*).  The court asked the jury to go back and consider this proposal. (1 ER 049).  If the jury did not think this would be helpful, the court would not force it on them.  (*Id*).

///

After considering the court's questions, the jury presented another note, asking the court to define "reasonable / possible doubt." (1 ER 051). The court re-read the definition of reasonable doubt from Calcrim 220, which had been given to the jury earlier as a part of pre-deliberation instructions. (1 ER 051-52). The court found the court was uncomfortable giving a definition of the concept broader than the one given in the instructions. (1 ER 052).

The court then asked again if the jury would find it helpful to receive 10 to 15 minutes of additional arguments from lawyers. (1 ER 052). The jury replied that it would be helpful. (1 ER 053). The court then stated that each lawyer would argue for 15 minutes later that afternoon. (1 ER 054).

In his argument, defense counsel focused on the concept of reasonable doubt. Counsel defined it and told the jury that it was not lacking additional argument, but additional evidence, that they were earning for it and "that's reasonable doubt." (1 ER 055-56). Since the jury

apparently felt it needed more, it did not have an abiding conviction in the truth of the charges. (1 ER 056). Counsel also explained that the jury's job was not just to reach a verdict, but a just verdict, and that there was nothing wrong with not reaching a verdict. (1 ER 058-59.) Counsel concluded that the charges had not been proven beyond reasonable doubt. (1 ER 059).

The prosecutor's argument also addressed the meaning of the term "reasonable doubt." (1 ER 060). The prosecutor pointed out that 9 out of 11 Amaya's character witnesses also said that they Jocelyn to be honest. (1 ER 060). The prosecutor contended that if the jury believed Jocelyn's testimony, it was enough to prove the State's case. (1 ER 061). The prosecutor reiterated that Jocelyn had no motive to lie, and if there was one, it would have been presented. (1 ER 062). The prosecutor also said that there was no outside influence on Jocelyn to fabricate the charges, no logical reason presented about why she would lie about her favorite uncle,

and fair evaluation of Jocelyn's credibility required consideration of those facts. (1 ER 063). The prosecutor also argued that when Jocelyn reported the abuse, it was to a therapist who she did not think would take the information to any one else. (1 ER 063). Amaya was the one who had a motive to lie. (9 RT 474).

The prosecutor concluded her argument by stating that for the jury to acquit Amaya, the jury would have to find that an honest girl lied about a beloved uncle for no apparent reason, lied to her therapist, made false statements during a pretext call, and lied to the police. (1 ER 065-66).

The trial court gave no particular instructions about how to consider the supplemental argument. (1 ER 055, 067-68). The court did ask the jury to back to continue their deliberations. (1 ER 067.) The jury returned to deliberation at 2:30 p.m. on June 10th and finished their deliberations at 4:20 p.m. (1 CT 188). The next day, after 12 minutes of deliberation, the jury reached a unanimous verdict. (1 CT 231).

- 55 -

After conclusion of the supplemental argument, the trial court allowed defense counsel to put on the record his earlier objections to allowing a supplemental argument and to the order of the argument (defense counsel believed the prosecutor should have gone first). (1 ER 068). Defense counsel objected that by allowing additional argument, "especially under these circumstances" (presumably referring to the jury deliberating for a long time, declaring themselves at a "standstill," and identifying the issue of disagreement), the court was injecting itself and counsel into the deliberative process and interfering in it. (*Id*).

The court had allowed supplemental argument under *People v. Young*, 156 Cal. App. 4th 1165 (2007), and permitted the prosecutor to go last because the State has the burden of proof. (1 ER 071).

### 2. California Court of Appeal's rejection of the claim

In his state appeal, Amaya argued that the trial court abused its discretion in permitting supplemental closing argument, which also

resulted in violation of Amaya's Sixth and Fourteenth Amendment rights. (State Court Exhibit 1, State AOB 34, 38). Amaya also argued that his trial attorney was ineffective for not making that federal due process objection in the trial court. (*Id* at 45).

The California Court of Appeal held that there was no abuse of discretion in allowing the supplemental argument. The court reasoned that such an action was within the discretion of the trial court under California law. (1 ER 039). The trial court asked the jury on what issue more guidance would help and whether they would find additional argument from the lawyers helpful; the jury identified the issue as definition of reasonable doubt and said additional argument would help. (*Id*). And the court also found that none of the remarks by the trial court were coercive. (*Id*).

Plus, while Amaya could point to two federal circuit decisions finding allowing of supplemental closing argument to a deadlocked jury an

abuse of discretion, the California Court of Appeal declined to follow them.

(1 ER 040).  The court reasoned that California law specifically allowed

supplemental closing arguments.  (*Id*).

Finally, the court found no ineffective assistance of counsel in failing

to object under federal due process grounds because the objection would

have been futile.  (1 ER 040).

**3.    The district court finds the California Court of Appeal's denial is not objectively unreasonable**

Amaya renewed his federal due process claim before the district

court, but that court found the state appellate court's denial of the claim

was not unreasonable.  (1 ER 017-21).  The district court found *Lowenfield v.*

*Phelps*, 484 U.S. 231 (1988) and *Allen v. United States*, 164 U.S. 492, 501–02

(1896) to be the clearly established federal law.  (1 ER 018).  The court

found no relevant Supreme Court law directly on point and Amaya's

supporting were circuit court cases, which do not set forth clearly

established federal law for AEDPA purposes.  (1 ER 019).

- 58 -

And while the district court questioned the wisdom of a California rule of court permitting reopening of argument after jury deliberations have began,[2] the court also found it was not unreasonable for state court to follow its own law (absent Supreme Court guidance).  (1 ER 019-20).  The state court also of appeal looked at the totality of the circumstances surrounding the jury questions, the trial court's responses, and the lawyers' supplemental arguments.  (*Id*).  The state court's finding of no coercion was reasonable.  (*Id*.)

///

///

///

///

///

---

[2] California is one of only three states that permit giving supplemental arguments to a deadlocked jury.  *United States v. Evanston*, 651 F.3d 1080, 1089 (9th Cir. 2011), citing Ariz. R. Crim. P. 22.4, Cal. R. Ct. 2.1036, and N.D. R. Ct. 6.9.

**B.    The State Court Violated Amaya's Sixth and Fourteenth Amendment Rights By (1) Determining the Reason for Jury Deadlock and (2) Permitting the Lawyers to Inject Themselves into Jury Deliberation by Providing Supplemental Argument on a Factual Issue the Jury Was Struggling to Decide**

**1.    Under clearly established federal law in *Lowenfield*, Amaya's constitutional rights were violated if, under the totality of circumstances, the state court's actions had a coercive effect on the jury verdict**

In his jury trial, Amaya was entitled to an uncoerced verdict.

*Lowenfield*, 484 U.S. at 241.  To determine whether the guilty verdict was

coerced, the California Court of Appeal had to look at the trial court's

decision to permit supplemental argument "in its context and under all the

circumstances."  *Id*. at 237; see also *Parker v. Small*, 665 F.3d 1143, 1137 (9th

Cir. 2011) [applying *Lowenfield* in the AEDPA context].

In *Lowenfield*, also a habeas case, after a capital sentencing jury

deadlocked, the judge polled the jury to find out if additional deliberations

would help.  Eleven jurors said yes and one said no.  The trial court then

reinstructed the jury that if it could not reach a verdict, the court would

- 60 -

impose a life without parole sentence. Thirty minutes later, the jury returned with a death sentence verdict. *Lowenfield*, 484 U.S. at 235. The petitioner argued the court's instruction amounted to coercion. *Id*. at 237-38.

Lowenfied held that to consider the petitioner's due process claim, the court had to consider the challenged supplemental instruction "in its context and under all circumstances." *Id*. at 237, quoting *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam). That is the same standard the Supreme Court had previously used in cases involving its exercise of supervisory powers of lower federal courts. *Lowenfield*, 484 U.S. at 237; *Smith v. Curry*, 580 F.3d 1071, 1081 (9th Cir. 2009) [applying *Lowenfield* in the AEDPA context].

Using that standard, *Lowenfield* held the supplemental instruction was not coercive because it did not speak directly to the holdout juror. *Lowenfield*, 484 U.S. at 237–38. *Lowenfield* stressed the trial court there did

- 61 -

not know how the jurors were divided numerically.  *Id*. at 240.   An instruction that the jury must reach a decision in the case is coercive.  *Id*. at 239.

In contrast, here, the trial court obtained the information about how the jury was divided on the merits, what issue divided the jury, and permitted the lawyers to submit additional arguments directly addressing the factual issues dividing the jury.   That is precisely the argument the prosecutor made.  (1 ER 060-67).

*Smith*, 580 F.3d 1071, is also instructive because it involves applying the *Lowenfield* standard under AEDPA.[3]  At issue in *Smith* was an issue like ours—an instruction to a deadlocked jury to consider certain pieces of evidence that a long holdout juror had questioned.  *Smith*, 580 F.3d at 1079. The trial court already knew what was dividing the jury and commented on specific evidence to address those concerns of the holdout juror.  *Id*. at

---

[3] See also *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) [habeas court may look to Circuit precedent to decide whether it has already held that a particular

1081.

*Smith* held that on those facts, the California Court of Appeal's rejection of the due process / juror coercion claim was objectively unreasonable. *Smith*, 580 F.3d at 1082–83. *Smith* reasoned that the trial judge knew what divided the jury and directed the jury to consider particular portions of the evidence. *Id.* The judge's comments were addressed to the holdout juror, the court used mandatory language to direct the jury to consider certain evidence, and the court's overall summary of the evidence was not neutral. *Id.* The combination of these factors made the state appellate court's rejection of the petitioner's claim objectively unreasonable under AEDPA. *Id.* at 1084.

Plus, this Court's decisions in *Evanston*, 651 F.3d 1080 helps the Court's resolution of the appeal. Though not arising under AEDPA, *Evanston* was decided under *Lowenfield* using the same standard for due process coerced verdict claims and claims arising under the supervisory

point is clearly established by Supreme Court precedent].

power of federal courts.  *Lowenfield*, 484 U.S. at 237; *Smith*, 580 F.3d at 1081.

And *Evanston* involved supplemental arguments given to a deadlocked

jury.  *Evanston* shows that it is beyond fair-minded disagreement that

*Lowenfield* applies to supplemental arguments given to a deadlocked jury.

*White*, 572 U.S. at 427.

　　　*Evanston* is factually analogous to this case because it involved a

supplemental argument given to a deadlocked jury over a defense

objection.  *Evanston*, 651 F.3d at 1083.  And as here, the district court in

*Evanston* then asked the jury if identifying the points of disagreement and

listening to additional argument by counsel as to those issues would be

helpful.  *Id*.  The court did not ask for the jury's numerical division.  *Id*.  The

government presented its supplemental argument on those issues, the

defense followed, and two hours later, there was a verdict.  *Id*. at 1084.

　　　*Evanston* held that the district court abused its discretion in allowing

supplemental arguments.  *Evanston* reasoned that allowing supplemental

arguments on factual issues created several risks of improperly intruding on the jury fact-finding process. *Evanston*, 651 F.3d at 1087–88. One of those risks was that "the parties' supplemental arguments, coupled with the judge's insistent on continuing after a second deadlock, injected the court and the attorneys into the jury's deliberative process, *thereby raising the specter of jury coercion*." *Id*. at 1088, emphasis added.

Another was the judge questioning the jury about its state of unfinished deliberations, violating the jury's deliberative secrecy. *Evanston*, 651 F.3d a t 1087. This was also coercive not because the jury's secrets are being let out of the deliberation room, but because they let the influence from the court and counsel in. *Id*. at 1088.

Finally, as to prejudice, even if a showing were required, the fact that the verdict came in a short time after the supplemental argument at least raised the possibility of coercion and resulting prejudice, which was enough. *Evanston*, 651 F.3d at 1092.

- 65 -

**2.    The California Court of Appeal's rejection of the claim was an objectively unreasonable application of *Lowenfield***

For several reasons, the state court of appeal's rejection of Amaya's claim was unreasonable.  Although the court cited the fact that the jury asked for help and said that additional argument would help, the key question is whether additional argument would be coercive under the circumstances.  *Lowenfield*, 484 U.S. at 241.  And coercion in this context is not limited to directly forcing the jury to come to a verdict.  A verdict can also be coerced by the court injecting itself and counsel into the deliberations to the degree they become partners in deliberation.  When the court injects itself and counsel in the process to that degree, those jurors not agreeing to a unanimous verdict would feel pressure to reach a verdict they would not otherwise reach.

Here, the court's actions had such a coercive effect.  After the jury informed the court that it was at a standstill after taking several votes and deliberating for more than one day (including getting a readback of all

- 66 -

critical testimony in the case), the trial court asked about the jury's numerical division and also if supplemental instructions or readback of testimony would help. (1 ER 048). When the jury revealed its division (7-5) and declined additional instructions or readback, the court still raised a specter of asking the jury to deliberate more. (*Id*). The court then asked whether the jury would be comfortable identifying the issue of disagreement and whether more argument from the lawyers on the issue would help. (1 ER 047-48). The court did say it did not want to force anything on the jury, but given the circumstances, there was a coercive pressure to come to a decision in effect from the court's actions. *Lowenfield*, 484 U.S. at 239.

And even worse, the trial court permitted supplemental argument, in which the prosecutor (who went last) did not limit herself to the legal definition of reasonable doubt (the issue mentioned by the jury), but argued extensively why she believed the State had proven its case. (1 ER

051, 060-67). For example, the prosecutor argued it would be unreasonable for the jury to view character evidence in isolation and say it was enough for reasonable doubt. (1 ER 060-61). The prosecutor also insisted Jocelyn's testimony alone was enough to prove her case. (1 ER 061). The prosecutor reiterated the evidence showed Jocelyn to be an honest girl who did not have a motive to fabricate. (1 ER 062). The prosecutor pointed out Amaya would have a motive to fabricate. (1 ER 065). In short, the prosecutor presented an argument focused on the factual issues at the heart of deliberations, making the prosecutor a part of the deliberations.

Coercion here may be subtle and the court's actions well-intentioned. But the key issue is the effect of the court's actions, not its intent. As noted earlier, the jury deliberated for a substantial amount of time, received readback of critical witness testimony, took several polls, reported itself deadlocked, and declined additional instructions or readback. If, in that situation, the court then throws itself and counsel directly into the heart of

- 68 -

deliberations, those holdout jurors would feel pressure to come to a verdict at the expense of their own individual beliefs.   And no instructions were given along with the supplemental argument, which would have underscored that the jury did not have to come to a decision at the expense of its individual views of whether the State had proven its case beyond reasonable doubt.  Under the totality of the circumstances, this is no different if a jury was explicitly told it had to come to a decision. *Lowenfield*, 484 U.S. at 239.

For these reasons, the appellate court's conclusion that none of the trial court's remarks were coercive is objectively unreasonable.  Given the circumstances and the timing of the events, the court injecting itself and counsel into deliberations by allowing supplemental argument reasonably likely had a coercive effect on the verdict.

Finally, it was not reasonable for the court of appeals to rely on the fact that California rules allow for supplemental argument at trial court's

- 69 -

discretion.  While the trial courts enjoy broad discretion in managing trial

procedures (including deliberations), that discretion is not unlimited.  As

noted earlier, Amaya has Sixth and Fourteenth Amendment right not to be

convicted based on a coerced jury verdict.  *Lowenfield*, 484 U.S. at 241.

Under the totality of circumstances, that right was violated here.

**C.**    **Amaya Need Not Show Prejudice to Obtain Habeas Relief; But if Such Showing is Required, the Verdict Came Shortly After the Offending Closing Argument, Creating Grave Doubt That the Argument Had Substantial and Injurious Effect on theVerdict**

In *Smith*, an AEDPA case applying *Lowenfield*, this Court ordered

habeas relief without a showing of prejudice.  *Smith*, 580 F.3d at 1084.

Moreover, the fact that the verdict came in less than two hours of

deliberation after the offending supplemental argument is sufficient to

show prejudice.  *Evanston*, 651 F.3d at 1092.

///

///

///

- 70 -

**D.      To the Extent Denial of this Claim Is Based Under the Rubric of Ineffective Assistance of Counsel, the California Court of Appeal's Denial of that Claim is Objectively Unreasonable**

In the alternative, the state appellate court's conclusion that trial counsel was not ineffective in failing to object to supplemental arguments to a deadlocked jury on federal constitutional grounds was unreasonable.

The clearly established federal law for the purpose of AEDPA on this theory is *Strickland v. Washington*, 466 U.S. 668 (1984).

*Cullen*, 563 U.S. at 189; *Hedlund v. Ryan*, 854 F.3d 557, 582 (9th Cir. 2017) [on federal habeas review of ineffective assistance of counsel claims, habeas courts under AEDPA apply *Strickland*]

The state court's application of *Strickland* was objectively unreasonable.  The state court found that the claim failed because objection by counsel would have been futile given the court's resolution of the merits of the underlying claim.  (1 ER 040).  But for the reasons already explained, the California Court of Appeal's rejection of that underlying claim was an

- 71 -

unreasonable application of *Lowenfield*.  Thus, counsel failed to preserve what would have been a meritorious objection.  Trial counsel had a duty to be aware of the applicable law and how it applied to his client's case. *Strickland*, 466 U.S. at 688.  Counsel's failure to preserve a meritorious objection is unreasonable performance under *Strickland*.

As to prejudice, because the California Court of Appeal did not reach the issue of prejudice, this Court examined de novo the prejudice prong of *Strickland*.  *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).  To show prejudice, Amaya would have to show a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 691–92.  A probability is reasonable if it is sufficient to undermine confidence in the outcome.  *Id*. at 694.

For the reasons stated in the preceding sections of the argument, the objection counsel failed to make would entitle Amaya to a reversal without a showing of prejudice.  This fact alone is enough to show prejudice under

- 72 -

*Strickland*, as making the objection would have ensured a more favorable outcome.

Plus, to the extent a showing of prejudice is required, the verdict came less than two hours of deliberation after the offending supplemental argument. This fact is enough to establish prejudice for the underlying claim and for this closely-related ineffective assistance claim.

## Conclusion

Based on the foregoing, this Court must issue an order (1) reversing the district court's order denying the petition, and (2) directing the district court to issue the requested writ.

DATE: December 23, 2019          By:      s / Gene D. Vorobyov

Attorney for Appellant
ALEXIS JOEL
AMAYA

## Certificate of Related Cases

I certify that I am unaware of any related cases under Circuit Rule 28-2.6.

DATE: December 23, 2019          By:    s/ Gene D. Vorobyov


Attorney for Appellant
ALEXIS JOEL
AMAYA

**Certificate of Compliance with Circuit Rule 32-1**

Under Federal Rule of Appellate Procedure 32 (a)(7)(c), and

Ninth Circuit Rule 32-1, I hereby certify that the above brief uses 14-

point Palatino Linotype font, that the text is double-spaced and

footnotes are single-spaced.  I further certify that according to the

"word count" feature of the Microsoft Word program in which this

brief is prepared, the total word count (not including the cover,

tables of contents and authorities, certificate of compliance with

Rule 32-1, statement of related cases, and the proof of service) is

11,408 words

DATE:  December 23, 2019        By:        s/ Gene D. Vorobyov

                                         _____

                                         Attorney for Appellant
                                         ALEXIS JOEL AMAYA